IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | No. 13 CR 328 |
| v. | ) | |
| | ) | Hon. Samuel Der-Yeghiayan |
| ABDELLA TOUNISI, | ) | |
| Defendant. | ) | |

## ABDELLA TOUNISI'S SENTENCING MEMORANDUM

**TABLE OF CONTENTS**

I. INTRODUCTION ............................................................... 2

II. GUIDELINES ................................................................... 3

III. SECTION 3553(a) FACTORS ........................................... 3

    A. History and Characteristics ................................................ 3

        1. *Family and Background* ........................................ 3

        2. *Compassionate Spirit* ........................................... 4

        3. *Depression and Isolation* .................................... 4

        4. *Acceptance, Self-Reflection, and Change* ............ 5

        5. *His Future* ............................................................ 6

    B. Nature and Circumstances of the Offense ......................... 7

    C. The Terrorism Enhancement Substantially Overstates Abdella's Criminal History ................................................................. 9

    D. Deterrence ........................................................................ 13

        1. *First Time-Offender* ............................................ 13

        2. *Youthful Offender* ............................................... 13

        3. *Strong Family Ties Lessen the Risk of Recidivism* ........ 15

        4. *Swiftness and Surety, Not Severity* ..................... 15

        5. *General Deterrence* ............................................. 16

    E. Just Punishment .............................................................. 17

    F. Need to Avoid Unwarranted Sentencing Disparities: *United States v. Khan* and *United States v. Conley* .................................. 18

    G. Incapacitation ................................................................. 21

H.      Rehabilitation .................................................................................. 21

IV.     CONCLUSION .................................................................................... 22

Abdella Tounisi, through his attorneys, Molly Armour, Patrick Blegen, and Lisa Wood, and pursuant to Rule 32 of the Federal Rules of Criminal Procedure, and 18 U.S.C. § 3553(a), as well as the Sixth Amendment to the Constitution of the United States and the Supreme Court's opinion in *United States v. Booker*, 543 U.S. 220 (2005), respectfully submits this sentencing memorandum.  Mr. Tounisi seeks a sentence of 84 months, followed by a supervised release term of ten years.  Such a sentence which would comply with the statutory directives of 18 U.S.C. § 3553(a) and justice.

## I.      INTRODUCTION

A sentence must be "sufficient, but not greater than necessary" to satisfy the purposes of sentencing.  18 U.S.C. § 3553(a).  The statutory sentencing factors found in section 3553(a) provide the Court with the framework upon which to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing by taking into account, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed to satisfy the purposes of sentencing.  Courts are required "to consider every convicted person as an individual[.]"  *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (internal quotations omitted).

As recognized by the Senior U.S. Probation Officer's recommendation of a substantially below Guidelines sentence of 120 months, there are specific circumstances in this case that call for a below Guidelines sentence.  USPO Sentencing

Recommendation, at 2 (Sentencing Rec.).  The punishment must not just fit the offense, it must fit the offender.  Below are the reasons why a seven-year sentence is sufficient but not greater than necessary for Abdella Tounisi.

## II.  GUIDELINES

The Defendant does not dispute the Guidelines calculations embodied in the Presentence Investigation Report (PSR).  As set forth *infra* III.C, the defense suggests that a criminal history category VI overstates Defendant's criminal history and that sentence below the range calculated by probation would be appropriate on section 3553(a) grounds.

## III.  SECTION 3553(a) FACTORS

## A.  History and Characteristics

### 1.  *Family and Background*

Abdella Ahmad Tounisi is the son of two Jordanian immigrants.  He was born in Massachusetts and grew up in the suburbs of Chicago.  His mother, Seham Tounisi explained that she raised her family "to love the United States of America."  PSR, ¶ 45. His father, Ahmad "loves the United States for the opportunities it has provided."  PSR, ¶ 46.  Family friend Yusra Shihadeh remembers Abdella as "proud to be part of this country and be given all the opportunities to be something greater."  Yusra Shihadeh Letter, at 1 (Exhibit B).

To his family and those who knew him, Abdella was always a nice boy with a kind heart.  Yusra Shihadeh describes him as "well mannered, soft spoken and extremely respectful to those around him."  Exhibit B, at 1.  He is a shy, courteous young man.  His

mother's description of him as "decent, naïve, simple, pure, youthful" echo letters from family and friends.  PSR, ¶ 45.

### 2. Compassionate Spirit

Abdella took charity work to heart; he was known for always doing things to help others in need.  His brother Faissal Tounisi remembers one time that Abdella went through their home and gathered up everyone's unused clothes to send off to those in need.  Faissal Tounisi Letter (Exhibit C).  His mother talked to agents about Abdella's desire to go help those affected by Hurricane Katrina when he was just eleven years old.  Abdella is an exceptionally empathic young man who cares deeply about people on an individual and community level.

### 3. Depression and Isolation

Another responsibility he took seriously was his role as the eldest sibling in his family.  Yusra Shihadeh, at 1.  He always tried to protect his younger siblings, and helped out in any way he could.  And, his early childhood upbringing was loving and joyful.  *See* Leena Abushanab Letter (Exhibit D).

But, his father worked constantly and struggled to keep steady employment.  PSR, ¶¶ 41, 46, 47.  In the wake of 9/11, Ahmad Tounisi faced discrimination at work.  Dr. Marc Sageman Report (Sageman Report), at 1.[1]  He went from job-to-job and had difficulty supporting the family.  In 2008, the family lost their home in St. Charles.  PSR, ¶ 41. They were uprooted frequently after that.  PSR, ¶ 41.  Abdella moved "from school

---

[1] Dr. Marc Sageman conducted an examination of Abdella as an expert in the fields of forensic psychiatry and terrorism.  As part of his report, he interviewed Abdella Tounisi and reviewed discovery in this matter—both classified and non.  Dr. Sageman's educational and professional background makes him uniquely qualified to assess Mr. Tounisi.  Dr. Sageman's Report as well as his *curriculum vitae* will be tendered to the

to school from one neighborhood to another." Ahmad Tounisi Letter, at 2 (Exhibit A). His father explained that Abdella was "particularly impacted by the family's financial problems, most likely because he was the eldest." PSR, ¶ 46. As the eldest, Abdella felt a suffocating sense of responsibility. He was isolated and immovably depressed. PSR, ¶ 59; Sageman Report, at 3.

In school, he fared no better. As a child, Abdella did not feel accepted by his classmates because he was a Muslim and endured prejudice and bullying. Sageman Report, at 2. His high school years were pock marked with upheavals; he was enrolled in four different high schools on five separate occasions. PSR, ¶ 66.

To numb his disconnectedness, he first turned toward video games, then marijuana, then to the plight of the Syrian people. Sageman Report, at 3; PSR, ¶ 64. Rather than get counseling for his depression, he dug into religion for clean and perfect answers. PSR, ¶ 60. Abdella was looking for somewhere to belong. No one in his life ever imagined him as someone who would believe in violence.

His deep desire to belong and his youth was, in some way, exploited by the agents who were placed in his path at various times. In the months leading up to his arrest, he was even befriended by a confidential source embedded in his classes at College of DuPage County. Instead of pushing him towards a productive use of his life, he was encouraged to isolate and take a different path.

### 4. Acceptance, Self-Reflection, and Change

At eighteen years of age, Abdella Tounisi found himself arrested and detained at the Metropolitan Correctional Center (MCC). The shock was like a bucket of ice water

---

parties and permission will be sought to file such under seal.

for Abdella. By May 2015, Abdella was heard expressing his deep remorse and for what had happened. PSR, ¶ 60. And, he has expressed that remorse repeatedly. Exhibit B, at 1. He spoke candidly with the U.S. Probation Officer and related that he was grateful for having been "saved from myself." PSR, ¶ 62. He was cooperative with the Probation Officer, and forthcoming. PSR, ¶ 18. Today, Abdella feels mentally healthy. PSR, ¶ 62. Importantly, he is a self-reflective and analytical young man capable of correcting his flaws when he recognizes them and taking others criticisms and suggestions to heart.

5. *His Future*

More than anything, Abdella wants an education. He was attending College of DuPage before he embarked on this offense. While in the MCC he has availed himself of any educational options he could. From October to December 2013, he took a program focused on criminal errors and thinking called "Get Your Mind Right." PSR, ¶ 68. He had perfect attendance and participation. *Id.* Then, in May 2015, Abdella completed an anger management course. Anger Management Certificate (Exhibit E). And, he also took a parenting class, not because he is a parent but because he wanted some insight and ability to help with his youngest sibling who was born while Abdella was in custody. He is also a regular attendant at the MCC's Friday prayers.

He is a graduate of St. Charles High School. By Abdella's own admission, he didn't always apply himself in school. But, his high school records reveal that he was considered "good" in the areas of courtesy and getting along well with other students. PSR. ¶ 66.

In his report, Dr. Sageman concludes that Abdella's history does not show "any increased risk of violence in comparison to the normal population" and opines that he is

6

"not an increased risk of presenting a danger to the public in the United States." Sageman Report, at 9. Abdella did not show signs of being brainwashed, displayed no abnormal fixed ideas, and "did not seem particularly ideologically oriented." *Id.* at 9, 10.

The Court has seen first-hand the community support for Abdella at various court dates throughout the years. His family is committed and motivated to support and positively influence Abdella. Sentencing Rec., at 2. He will be welcomed and forgiven by his community, fostering a healthy and true sense of belonging.

Lastly, Abdella is nothing if not persistent and strong willed. Those characteristics served him poorly as a lost 18-year old, but bode tremendously for his capacity to grow and move forward building a successful life.

**B.      Nature and Circumstances of the Offense**

Abdella was arrested at O'Hare airport where he was trying to get on an airplane to fly to Syria to fight against Bashar al-Assad's regime. The group he sought to join was Jabhat al-Nusrah, an organization which had been recently designated as Foreign Terrorist Organization. He was only 18 years old—impulsive and immature. His was one of the first so-called "traveler" cases in our district. As Dr. Sageman explained, Abdella was willing to join any group that was fighting the Assad regime in Syria. He recognized Jabhat al-Nusrah as the best equipped, and that was the only group offering him an opportunity to join—albeit an offer from an undercover agent. Sageman Report at 9-10. That Abdella sought to join a designated terrorist organization is indisputable and he has fully admitted that fact. But he did not seek to join *because* it was so designated. Had a similar opportunity come from a non-designated group, he may not be in jail today. Of course, he may well instead have been killed in Syria – a fact he

7

acknowledges and appreciates.

The nature and circumstances of the offense cannot be divorced from what was happening in young Abdella's life at the time. Abdella had moved around for five years. He felt isolated and cut off for being Muslim and Arab. He was depressed and lonely.

He met a young man who felt the same – Adel Daoud. They built a kinship out of their otherness, and weren't alone anymore. Abdella was excited about Arab Spring and the potential it held. Sageman Report, at 3. He felt a strong connection with the Arab and Muslim world and was proud to be a Muslim. *Id.* As the promise of Arab Spring wilted and the Syrian war began, Abdella found himself "glued to his computer watching developments." *Id.* He became obsessed. He spent four to eight hours a day watching videos on You-Tube and developments in Syria. The videos turned from jubilant celebration to gruesome horrors—torture, shootings, bombings, and bloody hospitals. *Id.* at 4. As a deeply compassionate person, Abdella would cry when he watched the news, especially the pain he witnessed in Syria. He would ask "why isn't anyone helping them?"

With regard to Mr. Daoud, Abdella undoubtedly exhibited critically poor judgment in friends and in life decisions. But as is clear from family letters and from Dr. Sageman's knowledgeable analysis, Abdella at his core he is a young man who wants to make the world a better place and identifies with victimized Muslims worldwide. His fleeting dalliance in 2012 with Mr. Daoud's obsession with targeting civilians was skeptically conceived and quickly abandoned. Sageman Report, at 6. Abdella realized his mistake swiftly and backed out. *Id.* at 10. Rather than seriously plotting to harm human beings on American soil, Abdella actually tried—unsuccessfully—to dissuade

Daoud from traveling down that path. *Id.* at 6. And, for awhile he believed that he had. Discovery tendered by the government makes clear that Abdella did in fact seek to dissuade Mr. Daoud of his thoughts regarding targeting civilians. He sought out and obtained an authoritative religious opinion to convince Mr. Daoud he was wrong. He made Mr. Daoud promise he would not do anything. Mr. Daoud promised, and at one point indicated that he had deleted the phone number of the undercover agent who was posing as a terrorist. All of this was to no avail; Mr. Daoud pursued his plans without Abdella and without Abdella's knowledge.

As to the actual offense of conviction, provision of material support to a designated terrorist organization, the nature and circumstance of the offense is unquestionably serious. No one was harmed, however, and Abdella freely admitted to the undercover agent posing as a recruiter that he had no fighting skills. His desire was to assist victimized Muslims and help Jabhat al-Nusrah in its fight against Assad – a fight from which he realized he would likely not return. Locked away in detention, Adbella quickly awakened and recognized the errors in his choices and in his thinking. The offense is significant, but a sentence of 84 months imprisonment is also significant and would be sufficient but not greater than necessary to fulfill the requirements of section 3553.

## C. The Terrorism Enhancement Substantially Overstates Abdella's Criminal History

Sentencing Guideline section 3A1.4 provides for a 12 level increase in the offense level, and automatic placement in criminal history category VI if a defendant's "offense is a felony that involved or was intended to promote a federal crime of terrorism." According to Application Note 1, a "federal crime of terrorism" is given the same

definition as used in 18 U.S.C. § 2332b(g)(5). That section provides a two-pronged definition for a "federal crime of terrorism." To qualify as a federal crime of terrorism an offense must be a violation of any one of a list of enumerated statutes found in 18 U.S.C. § 2332b(g)(5)(B); it must also be an offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

The defense conceded in the plea agreement that the terrorism enhancement is applicable, and does not contest that here. In considering an appropriate sentence under § 3553, however, the defense submits that two issues distinguish this case from the typical case involving the terrorism enhancement. First, despite having no criminal history whatsoever, Abdella's criminal history category becomes the highest possible—Category VI—based solely on the enhancement. Second, the "conduct of government" that Abdella sought to influence through his actions was that of the Assad government in Syria – a brutal, terror-sponsoring regime whose humanitarian violations the United States is still seeking to deal with to this day.

> Syria has been designated a State Sponsor of Terrorism since December 1979. Additional sanctions and restrictions were added in May 2004 with the issuance of Executive Order 13338, which implemented the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003 (SAA) and imposed additional measures pursuant to the International Emergency Economic Powers Act (IEEPA) (50 U.S.C. 1701 *et seq*.).
>
> Since the uprisings began in March 2011, the U.S. government has intensely pursued calibrated sanctions to deprive the regime of the resources it needs to continue violence against civilians and to pressure the Syrian regime to allow for a democratic transition as the Syrian people demand. The first step was taken with Executive Order 13572 in April 2011, which blocks property of Syrian officials and others responsible for the commission of human rights abuses, including those related to repression.

*See* U.S. Dep't of State, Syria Sanctions, https://www.state.gov/e/eb/tfs/spi/

syria/.

Thus, while the terrorism enhancement is legally applicable to Abdella's conduct, the twelve-level enhancement he receives is the same enhancement that an individual who seeks to join a group intending to target a United States ally or the United States itself would receive. This is not, of course, to say that Jabhat al-Nusrah is a positive group or should not be designated as a terrorist organization. It is also not to say that Abdella's conduct was not lawful. Jabhat al-Nusrah has earned its designation and Abdella's conduct was criminal. But, Abdella's offense was directed at providing support to an organization fighting against the Assad regime; that fact certainly distinguishes him from those who provide material support to terror organizations intending to attack the United States, or intending to attack United States allies.

Moreover, even when the sentencing guidelines were mandatory, district courts had the discretion to depart downward pursuant to USSG § 4A1.3, "[i]f reliable information indicates that a defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." In *United States v. Benkahla*, 501 F.Supp.2d 748 (E.D. Va. 2007), a Virginia district court sentenced a defendant who had been convicted of perjury regarding his travels to Pakistan to participate in a jihad training camp, including false statements about firing an AK47 and a rocket propelled grenade ("RPG"). *Id.* at 750. The terrorism enhancement was applied, but the court granted a downward departure based on § 4A1.3. The court found both that a criminal history category of VI over-represented the seriousness of the defendant's criminal history and the likelihood that he would commit other crimes. As to the former, the court noted that, "[a]fter

applying § 3A1.4, Defendant's criminal history is maximized at category VI. For an individual with no criminal record and no evidence of ever having committed an illegal act in his life outside of the conduct for which he is convicted, this clearly over-represents the seriousness of his criminal history." As to the latter, the court concluded that the defendant was not a terrorist and does not share the same characteristics of a terrorist.

Both of these conclusions are equally true of Abdella. Although only eighteen at the time of his arrest, he had no other convictions or arrests. As explained in his sentencing character letters, and in the report of Dr. Sageman, he is a compassionate and empathetic young man who became engrossed by the suffering and victimization of Muslims in Syria. Dr. Sageman also concludes that Abdella is of no greater risk than the normal population of being a danger to the public.

Even in his relationship with Adel Daoud, the relationship that brought him to the attention of law enforcement in the first instance, Abdella demonstrated that although he will be forever labeled as one by his conviction, he is not a terrorist. Regrettably, Abdella did not alert his elders, law enforcement, or try to get Daoud some counseling or mental health assistance. Instead, after an initial acquiescence, Abdella argued with Mr. Daoud, did his best to change his mind, and ultimately sought out authoritative opinions to convince Mr. Daoud he was wrong. He even received Mr. Daoud's promise that he would not do anything. Although Mr. Daoud's promise turned out to be a hollow one, it is a promise he would never have had to make to a fellow terrorist. Abdella is not a terrorist, and the 12-level enhancement and Criminal History Category of VI required by the terrorism enhancement seeks too much in this case.

### D. Deterrence

#### 1. *First Time-Offender*

Importantly, this case represents Abdella's first arrest and conviction. The United States Sentencing Commission has conducted numerous studies demonstrating that individuals facing their first term of incarceration are a remarkably low risk to recidivate. The fact that he has no prior convictions places Abdella in the category of those least likely to commit further crimes.[2] "Recidivism data analyzed by the [Sentencing] Commission indicate that 'first offenders' generally pose the lowest risk of recidivism."[3] Likewise, defendants such as Mr. Tounisi who have never before been incarcerated generally require a shorter term of imprisonment to achieve the same goal of protecting the public from further crimes of the defendant. *See United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D.Wisc. June 11, 2005) (Adelman, J.).

#### 2. *Youthful Offender*

Furthermore, this Court should consider Abdella's young age—eighteen years old—at the time of the offense. The Supreme Court's opinion in *Gall v. United States*, 552 U.S 38 (2007), emphasized a previously neglected mitigating factor; *i.e.*, a defendant's immaturity at the time of the offense. The district court rendering the

---

[2] *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factors Score*, U.S. Sentencing Commission, pp. 14-15 (Jan. 4, 2005) (suggesting that Criminal History Category I does not adequately take into account the lack of recidivism for first time offenders).

[3] PROPOSED AMENDMENT 3 TO THE U.S. SENTENCING GUIDELINES ON FIRST-TIME OFFENDERS/ALTERNATIVES TO INCARCERATION (Aug. 25, 2017) (citing U.S. Sentencing Comm'n, "RECIDIVISM AMONG FEDERAL OFFENDERS: A COMPREHENSIVE OVERVIEW," at 18 (2016)).

below guideline sentence in *Gall* placed significant import on the defendant's age (a college student) at the time of his offense. In upholding the sentence, the Supreme Court emphasized the district court's reliance on the defendant's youth, lack of maturity, and drug use at the time of his offense. The Court took particular note of the district court's reliance on medical studies indicating that full brain development, and therefore maturity, may not be reached until age twenty-five—the age Abdella reached only a month prior to his arrest. *Id.,* at 601. The district court stated:

> Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. *See* Elizabeth Williamson, *Brain Immaturity Could Explain Teen Crash Rate,* Wash. Post, Feb. 1, 2005 at A01 (summarizing a recent National Institutes of Health ("NIH") study that suggests "that the region of the brain that inhibits risky behavior is not fully formed until age 25"). This is of critical importance in the area of criminal law. The Sentencing Commission, in its studies, has deduced that recidivism rates drop as the age of defendants increase. *See United States v. Nellum,* No. 2:04-cr-30-ps, 2005 WL 300073 (N.D.Ind. Feb. 3, 2005). The Supreme Court based its most recent death penalty decision, *Roper v. Simmons,* on studies indicating adolescents are less culpable for their actions than adults. *See* --- U.S. ----, ----, 125 S.Ct. 1183, 1195, 161 L.Ed.2d 1 (2005) (stating that "as any parent knows and as the scientific and sociological studies respondent and his amici cite tend to confirm, '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' (citations omitted) It has been noted that 'adolescents are overrepresented statistically in virtually every category of reckless behavior.'") (quoting Amett, *Reckless Behavior in Adolescence: A Developmental Perspective,* 12 Developmental Review 339 (1992)). While the *Roper* court held imposition of the death penalty is unconstitutional for those persons who committed the death-eligible crime before the age of eighteen, the recent NIH report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

*United States v. Gall*, 374 F.Supp.2d 758, 762 (S.D. Iowa 2005).

As the Court can see from the PSR, while Abdella did not commit this offense while attending college as did the defendant in *Gall*, he certainly suffered from similar

youthful infirmities, such as substance abuse and depression.  In short, he engaged in the conduct, for which he now faces a lengthy sentence, as a result of, at least in part, his lack of maturity.  While immaturity does not excuse his conduct, it helps to contextualize his choices.  His youth, immaturity, and the concomitant inability to avoid impetuous and ill-considered actions all bear heavily on his decision to try and travel overseas.  A sentence of eighty-four months would ensure that Abdella would leave prison in a far better developmental stage, having conducted healthy self-reflection on his decisions.

### 3.    *Strong Family Ties Lessen the Risk of Recidivism*

There is significant evidence that strong family ties are an important component to lessening the risk of recidivism.[4]  Mr. and Mrs. Tounisi are unfailingly supportive of their son.  His entire family is committed to helping him succeed.  These years without him have been devastating.  They offer a strong and loving support system, which will help Abdella move forward with his life successfully.

### 4.    *Swiftness and Surety, Not Severity*

Moreover, decades of empirical research into evidence-based correctional practice reveal a uniformly accepted principle:  swiftness and surety of sanctions have a greater deterrent effect than severity of punishment.[5]  "The research evidence is

---

[4] *See* Mark T. Berg and Beth M. Huebner, *Reentry and the Ties that Bind: An Examination of Social Ties, Employment, and Recidivism*, 28 JUSTICE Q. 382, 384-86, 401-02 (2011); (hereinafter "*Reentry and the Ties that Bind*").  *See also* Solangel Maldonado, *Recidivism and Parental Engagement*, 40 FAMILY L. Q. 191, 196 (2006).

[5] *E.g.* FAYE S. TAXMAN, ERIC S. SHEPARDSON & JAMES M. BYRNE, TOOLS OF THE TRADE:  A GUIDE TO INCORPORATING SCIENCE INTO PRACTICE 62-63 (2004) (sponsored by the Department of Justice's National Institute of Corrections and the Maryland Division of Parole and Probation).

unequivocal that incarceration does not reduce offender recidivism."[6]

In the instant case, Abdella was arrested immediately after attempting to travel to Syria. He was detained at the airport, while waiting at his fate. He was quickly arrested and prosecuted, all of which was extensively covered in local and national media. There is no swifter and surer sanction. A severe penalty of lengthy incarceration here does not correlate to reduced recidivism.

> 5.    *General Deterrence*

As for general deterrence, it "occurs when the decision maker contemplates the punishment experiences of others."[7] Consequently, general deterrence "does not concern a 'connection' between behavior and consequences, but whether potential consequences already recognized by the decision maker seem sufficiently 'costly' to deter behavior."[8] Research shows that the "conforming influence" of extralegal consequences attendant indictment and prosecution—shame, fear of peer disapproval, embarrassment, and social stigma—to be far more effective than actual punishment in fostering general deterrence.[9] There can be no greater scarlet letter than being branded

---

[6] ROGER WARREN, NAT'L CTR. FOR STATE COURTS, EVIDENCE-BASED PRACTICE TO REDUCE RECIDIVISM: IMPLICATIONS FOR STATE JUDICIARIES 14 (2007), http://nicic.gov/library/files/023358.pdf. *See also* Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence,* 100 J. CRIM. L. & CRIMINOLOGY 765, 817-18 (2010) (discussing and reviewing studies on deterrence); Francis T. Cullen, Cheryl Lero Johnson & Daniel S. Nagin, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* 91 THE PRISON J. 48S, 50S-51S (2011).

[7] Daniel S. Nagin & Greg Pogarsy, *Integrating Celerity, Impulsivity, an Extralegal Sanction Threats into a Model of General Deterrence,* 39(4) CRIMINOLOGY, 865, 867 (2001).

[8] *Id.*

[9] *Id.* at 869. This is another way to approach the widely accepted principle that celerity

a terrorist.

In summary, empirical data and Abdella's own experiences demonstrate that he has been deterred, he is unlikely to recidivate, and he has been punished.

**E.     Just Punishment**

Abdella has now spent almost four and a half years in the MCC. To a man of his age, that is almost *20% of his life*. For someone with no prior criminal record, that is already significant punishment. Especially for one so young.

In Abdella's case that punishment is compounded by the opprobrium associated with the word "terrorism." It carries with it a social stigma that will haunt Mr. Tounisi. The position that he finds himself in today, convicted of a federal terrorism offense, facing a looming prison sentence and the daunting task of rebuilding his life, is already punitive. This, in and of itself, should assure the Court that he will never again run afoul of the law.

Moreover, Abdella will forever be a felon. This alone limits his future opportunities, and will have a significant punitive effect on the rest of his life. Finding a job with his kind of conviction or notoriety will make the effects of the conviction all the more acute. As extensively catalogued by District Court Judge Fredric Block, the

---

and surety of sanctions have a greater deterrent effect than severity of punishment. *E.g.* FAYE S. TAXMAN, ERIC S. SHEPARDSON & JAMES M. BYRNE, TOOLS OF THE TRADE: A GUIDE TO INCORPORATING SCIENCE INTO PRACTICE 62-63 (2004) (sponsored by the Department of Justice's National Institute of Corrections and the Maryland Division of Parole and Probation). *See also* Francis T. Cullen, Cheryl Lero Johnson & Daniel S. Nagin, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 THE PRISON J. 48S, 50S-51S (2011); Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. CRIM. L. & CRIMINOLOGY 765, 817-18 (2010) (discussing and reviewing studies on deterrence); ROGER WARREN, NAT'L CTR. FOR STATE COURTS, EVIDENCE-BASED PRACTICE TO REDUCE RECIDIVISM: IMPLICATIONS FOR STATE JUDICIARIES 14 (2007).

collateral consequences of such a conviction are vast.  *See generally United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073 (E.D.N.Y. May 24, 2016).  Abdella faces the daunting task of rebuilding his life while shackled to these collateral consequences. He stands before the Court at sentencing having already endured significant punishment.

**F.      Need to Avoid Unwarranted Sentencing Disparities: *United States v. Khan* and *United States v. Conley***

Additionally, title 18 United States Code Section 3553(a)(6), indicates that district court judges should consider, when imposing a sentence, "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  The defense submits that an examination of two recent cases involving attempts by youthful offenders to travel to Syria to join a designated terrorist organization, make clear that a sentence of 84 months imprisonment would be appropriate.

Abdella was eighteen years old when he attempted to board a plane at O'Hare airport, planning ultimately to travel to Syria and join Jabhat al-Nusrah in its fight against the Assad regime in Syria. Counsel have uncovered two cases of defendants of similar ages to Defendant who committed the offense of providing material support to terrorism by seeking to provide themselves as personnel to a designated terrorist organization.  Those two defendants, Shannon Conley (sentenced in the United States District Court for the District of Colorado) and Mohammed Hamzah Khan (sentenced in this district) received sentences of 60 months of imprisonment and 40 months of imprisonment respectively.

Ms. Conley's offense involved her attempt to travel to Syria and join ISIS where

she planned to meet and marry an ISIS fighter in Syria named Yousr Mouelhi.  Ms. Conley had first met Mr. Mouelhi on line, and they shared a mutual belief that Islam required participation in violent jihad.  In preparation for her travel to Syria and to assist ISIS fighter she met there, Ms. Conley joined and trained with the United States Army Explorers to be trained in U.S. military tactics and in firearms.  At the time she was arrested, Ms. Conley also had in her possession Mr. Mouehi's telephone number, certificates related to first aid and nursing, a field first aid manual, and a National Rifle Association certification.  At her home, agents found DVD's of lectures by Anwar Al-Awlaki, and books and articles about Al-Qaeda and jihad.  Agents also recovered shooting targets marked with the number of rounds fired and distances.  *See United States v. Shannon Conley*, 14 CR 163 (D. Colo.), Dkt. 37 (plea agreement).  In addition, it appears Ms. Conley had been warned multiple times by the FBI regarding her plans to travel to join ISIS prior to being stopped while attempting to leave the country.  *See* Dep't of Justice, Press Release, Colorado Woman Sentenced for Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization (Jan. 23, 2015).[10]  Although the criminal complaint and other documents on the docket are now sealed, Ms. Conley had purportedly come to the attention of law enforcement while sketching the interior rooms of a church.  *See* Kirk Mitchell, *Arvada teen jihadist wannabe sentenced to four years in prison*, DENVER POST, Jan. 23, 2015.[11]

Based on an agreement with the government, Ms. Conley pled guilty to

---

[10] https://www.justice.gov/opa/pr/colorado-woman-sentenced-conspiracy-provide-material-support-designated-foreign-terrorist

[11] http://www.denverpost.com/2015/01/23/arvada-teen-jihadist-wannabe-sentenced-to-four-years-in-prison/

conspiracy in violation of 18 U.S.C. § 371, referencing 18 U.S.C. § 2339B (material support to a designated terrorist organization), carrying a five-year maximum sentence. She was sentenced to 48 months imprisonment and a three-year term of supervised release.

When he was nineteen years old, Mohammed Hamzah Khan attempted to travel to Syria with two of his minor siblings to join ISIS. Mr. Khan and one of his minor siblings interacted with an ISIS recruiter on line, and Mr. Khan eventually saved enough money to purchase three roundtrip tickets to Istanbul, and obtained Turkish visas for himself and his siblings, intending to ultimately travel to Syria. Mr. Khan intended to work under the direction of ISIS and to do whatever they asked ranging from non-violent assistance to a combat role. *See United States v. Mohammed Hamzah Khan*, 14 CR 564 (N.D. Ill.) (Tharp, J.), Dkt. 81 (plea agreement). Mr. Khan wrote a farewell letter to his parents, explaining: (1) that they should not tell authorities of his plans; (2) that he and his siblings were on their way to Syria; (3) that there was an obligation to migrate to the Islamic State now that it has been established; (4) that he was upset he was now required as an adult to pay taxes that would be used to kill his Muslim brothers and sisters; (5) that he was upset with the decline and filth of Western society; and (6) that his family was invited to join him in the Islamic state. *Id*. at Dkt. 1 (criminal complaint). Various ISIS drawings and slogans like "come to Jihad," were also found in Mr. Khan's home.

Pursuant to a plea agreement, Mr. Khan pleaded guilty to violating 18 U.S.C. § 2339B(a)(1) (providing material support to a designated terrorist organization). Mr. Khan faced a maximum sentence of fifteen years imprisonment and a life term of

supervised release.  Pursuant to an agreement with the government based on his cooperation, the government agreed to recommend a sentence of 60 months, and the parties agreed to recommend a term of supervised release of not less than fifteen years. *Id.* at Dkt. 81.  The district court ultimately imposed a sentence of forty months imprisonment and a twenty year term of supervised release.  *Id.* at Dkt. 101 (J&C).

Abdella was eighteen years old at the time of the commission of his offense. While he does not have the distinguishing factor of a motion for downward departure from the government based on cooperation, his conduct is not significantly different than that of Ms. Conley or Mr. Khan such that a dramatically higher sentence is warranted.  Counsel have suggested that a sentence of eighty-four months imprisonment would be appropriate.  That difference, between Ms. Connelly's 48-month sentence, and Mr. Khan's 40-month sentence would account for the absence of a downward departure request from the government.

## G.  Incapacitation

Mr. Tounisi's history and characteristics evince no specific need for incapacitation.  His remorse, reflection, and maturation during the past four and half years demonstrate that the public need not be protected from him.

## H.  Rehabilitation

More than anything, Abdella Tounisi now needs rehabilitation.  He has been deterred and he has been punished.  What he needs is to further his education and pursue work and ultimately a career that is consistent with his intelligence and empathy.

## IV. CONCLUSION

Section 3553(a) directs this Court to impose a sentence that is "sufficient but not greater than necessary to comply with the purposes" of sentencing set forth in section 3553(a)(2). For all the reasons set forth herein, Abdella Tounisi respectfully requests a term of 84 months of incarceration, followed by a ten-year term of supervised release.

Dated:     September 28, 2017              Respectfully submitted,

                                           s/ Molly Armour
                                           One of the Attorneys for
                                           Abdella Tounisi

Molly Armour
Law Office of Molly Armour
4050 N. Lincoln Avenue
Chicago, Illinois 60618
773-746-4849
armourdefender@gmail.com

Patrick Blegen
Lisa Wood
Blegen & Garvey
53 W. Jackson Boulevard, Suite 1437
Chicago, IL 60604
(312) 957-0100