UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13 CR 328 |
| v. | ) | |
| | ) | Judge Robert M. Dow |
| ABDELLA TOUNISI | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT ABDELLA TOUNISI'S
MOTION FOR COMPASSIONATE RELIEF**

The UNITED STATES OF AMERICA, through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby responds to defendant Abdella Tounisi's motion for compassionate release. R. #111. Attached to this response, as an under-seal exhibit, are the defendant's medical records from the Bureau of Prisons ("BOP"). *See* Exhibit C. For the reasons set forth below, the government respectfully submits that defendant's motion should be denied in light of the applicable factors set forth in 18 U.S.C. § 3553(a).

## I. PROCEDURAL BACKGROUND

On May 16, 2013, defendant Abdella Tounisi was charged with attempting to provide material support, namely personnel, to a foreign terrorist organization, specifically Jabhat al-Nusrah, in violation of Title 18, United States Code, Section 2339B(a)(1) (Count One), for his attempt to travel to Syria to join Jabhat al-Nusrah. The defendant was also charged with willfully making materially false statements in a matter involving international terrorism, in violation of Title 18, United States Code, Section 1001(a)(2) (Count Two).

On or about August 8, 2015, the defendant pled guilty to Count One of the indictment pursuant to a written plea agreement.

On or about October 26, 2017, the defendant was sentenced to serve a term 180 months' imprisonment. R. #97. He is currently scheduled to be released from custody on January 26, 2026.[1]

## II.    FACTUAL BACKGROUND

On September 14, 2012, the defendant's close friend Adel Daoud was arrested for attempting to detonate an explosive device in downtown Chicago. 12 CR 723. Hours after Daoud's arrest, FBI agents interviewed the defendant, along with his parents, at his residence. During the interview, the defendant acknowledged that he had discussed with Daoud the topic of bombing concerts and nightclubs. The defendant admitted that he also contemplated traveling to Yemen to engage in jihad.[2]

Between February 2013 and April 2013, the defendant was enrolled at the College of DuPage. During this time, the FBI received information from a cooperating individual who was one of defendant's classmates. According to this individual, the defendant often skipped class and could be found in the college's computer, lab where he was seen viewing, among other sites, the webpage for Turkish Airlines, presumably to plan his travel to Syria. The cooperating individual and the defendant

---

[1] https://www.bop.gov/inmateloc/

[2] The factual background is derived from the government's sentencing memorandum. R. #84.

watched videos of Jabhat al-Nusrah attacks on Syrian forces during which the defendant expressed his approval.

*Defendant's Online Research*

In the months leading up to the defendant's attempt to leave the country, the defendant performed extensive online research related to martyrdom and violent jihad, such as searches for "shaykh sulayman ibn nasir al'ulwan[3] verdict permissibility martyrdom operations", "shahada[4] before death," and "martyrdom operations."

The defendant's plans for martyrdom centered on the terrorist group Jabhat al-Nusrah, a group that by then already pledged allegiance to Ayman al-Zawahiri and Al Qaeda. This designated foreign terrorist organization has claimed hundreds of terrorist attacks—ranging from more than 40 suicide attacks to small arms and improvised explosive device operations—in major city centers in Syria, leading to the death of numerous Syrians. The defendant was well aware of Jabhat al-Nusrah's violent exploits and its affiliation with Al Qaeda. He spent countless hours watching videos of Jabhat al-Nusrah suicide bombings and poured over articles about the group's ties to Al Qaeda (and even articles about its designation by the United States State Department).

---

[3] Sulayman ibn Nasir Al'ulwan is an Islamic scholar from the early fifteenth century who offered a defense of martyrdom operations.

[4] "Shahada" is an Arabic word that, in this context, appears to refer to martyrdom.

3

In addition, between January 2013 and March 2013, the defendant performed a number of internet searches regarding travel from the United States to Syria and the laws that govern such travel. In particular, defendant's research focused on travel from Chicago to Istanbul, Turkey, and then from Istanbul to Gaziantep, Turkey, a city that lies near the border of Turkey and Syria.

*Defendant's Family Attempts to Prevent Him from Traveling*

The defendant's parents, whom the defendant was living with, were aware of his plans to leave for Syria. In order to prevent his planned travel, his parents confiscated his passport.

Seizing the defendant's passport and urging him not to kill himself in battle did nothing to stop him. On March 1, 2013, the defendant applied for and obtained a P.O. Box in Aurora, Illinois. On that same day, he submitted a signed application for an expedited United States passport, claiming that he sought to travel to Jordan for 10-20 days on June 15, 2013. The defendant also submitted a signed "Statement Regarding a Lost or Stolen Passport" in which the defendant claimed his previous passport had been lost, when in fact it had been taken by his parents. The defendant directed that the passport be sent to his new post office box.

*Defendant Visits a Purported Jabhat al-Nusrah Website*

During the investigation, the FBI published a webpage that purported to recruit individuals to travel to Syria and join Jabhat al-Nusrah. On March 28, 2013, while performing a search for Jabhat al-Nusrah propaganda, the defendant visited

4

English and Arabic versions of the website. The top portion of the webpage stated, "A Call for Jihad in Syria," and depicted a photograph of an armed fighter. The website also included a Jabhat al-Nusrah training video, which the defendant viewed. That video depicted individuals wearing masks and fatigues, and engaging in training, such as running with firearms. The website stated, "come and join your lion brothers of Jabhat Al-Nusra who are fighting under the true banner of Islam, come and join your brothers, the heroes of Jabhat Al-Nusra."

The defendant reached out to the purported recruiter listed on the website, who unbeknownst to the defendant was an FBI employee. The two exchanged several emails, during which the defendant said that he planned to leave for Syria by travelling to Istanbul, Turkey, and then from Istanbul to Gaziantep. The defendant emphasized his willingness to die in battle, stating that "if the opportunity is given to me to attain shahada [martyrdom] I will take it."

On April 10, 2013, the defendant bought an airline ticket for an April 19, 2013, flight from Chicago to Istanbul, which the defendant related to the purported recruiter. On April 18, 2013, the defendant received from the purported recruiter a bus ticket from Istanbul to Gaziantep, where the defendant was to meet with "brothers" from Jabhat al-Nusrah who would take the defendant to a training camp. The next day, the defendant sent the purported recruiter an email describing what he would be wearing upon his arrival in Istanbul. The defendant noted that if he

5

failed to make it to Gaziantep, it would be because he was "arrested in the US or in Turkey."

On the evening of April 19, 2013, the defendant went to O'Hare International Airport with the intent to travel to Istanbul and join Jabhat al-Nusrah. At the airport, after proceeding through airport security and sitting down at the assigned gate, the defendant was questioned by Customs and Border Protection officers, who asked the defendant about his travel. The defendant lied to the officers, telling them that he was traveling to Turkey for three and a half days to "sightsee" and that he did not plan to visit any other countries. When confronted about the bus ticket to Gaziantep, which the defendant had in his carry-on luggage, the defendant falsely claimed he planned to tour Gaziantep as well.

## III. THE BOP'S RESPONSE TO COVID-19

As the Court is aware, from the moment the COVID-19 pandemic began, the Bureau of Prisons (BOP) made extensive changes to its operations, based on a plan that was prepared over many years, and refined in early 2020 in consultation with the Centers for Disease Control (CDC) and the World Health Organization. Those efforts continue. The BOP's success at many institutions in limiting the spread of the virus, and in stemming outbreaks when they occur, provides an important backdrop for the defendant's motion.

6

BOP's "action plan" is described in detail on the BOP's website.[5]  As part of that plan, all newly arriving inmates are quarantined and not released into the general population until 14 days have passed and the inmate has tested negative; inmate movement within an institution is restricted in order to promote social distancing; mask wearing by inmates and staff is required; all facility staff are screened for symptoms daily; social visiting has been suspended at nearly all institutions; and access by other outsiders is restricted to only those performing essential services, who are also screened before entry. When an outbreak does occur, any infected inmate is immediately quarantined, and all contacts (including entire housing units if warranted) are tested and quarantined as necessary, until all contacts return at least two negative tests in a two-week period.[6]

The BOP's strenuous efforts, now abetted by widespread vaccination (discussed below), have been fruitful. It is notable that the rate of deaths in federal

---

[5] See https://www.bop.gov/coronavirus/overview.jsp; https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp (last visited Oct. 7, 2022).

[6] In addition, acting under the authority granted in the CARES Act, the BOP has transferred many thousands of inmates to home confinement, focusing on nonviolent offenders who have served the majority of their sentences. This initiative, combined with the reduced number of new arrivals during the pandemic and the ordinary release of prisoners upon completion of their sentences, has led to a dramatic decrease in the total BOP population, which in turn has increased opportunities for social distancing and reduced the strain on BOP resources. The total BOP population is now more than 10% less than it was at the outset of the pandemic, and is at the lowest level in decades.

prisons has been comparable to that in the general U.S. population, a substantial achievement given the known risks of viral spread in a congregate prison setting.[7]

Specifically, as it pertains to defendant, the BOP reports that, as of October 3, 2022, FCI Terre Haute, the facility to which defendant is assigned, has 1 inmate and 0 staff members with confirmed coronavirus cases.[8]

### *Vaccinations*

BOP has worked to ensure that it received COVID-19 vaccines as they became available, and then offered the vaccines to all willing staff members and inmates, beginning first with staff members (who present a more likely vector for COVID-19 transmission into an institution), and then offering the vaccines to inmates in order of priority of need in accordance with CDC guidelines. As a court observed, "Since the vaccines became available, the Bureau of Prisons diligently and efficiently administered the doses allocated to it, leading all jurisdictions and Federal entities in its vaccine utilization rate." *United States v. Roper*, 2021 WL 963583, at *3 (E.D. Pa. Mar. 15, 2021) (Kearney, J.) (footnote omitted).

---

[7] The BOP reports that there have been 308 inmate deaths attributed to COVID-19 at BOP institutions (which at the outset of the pandemic held over 157,000 inmates), including 11 deaths from COVID-19 of inmates serving their sentences in home confinement; and there have been approximately 1,056,029 deaths from COVID-19 in the general U.S. population. *See* Federal Bureau of Prisons, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/; CDC, COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#datatracker-home (last accessed Oct. 7, 2022).

[8] See Federal Bureau of Prisons, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last accessed Oct. 7, 2022).

As of this writing, through intensive effort, BOP has offered a vaccine to every inmate in BOP-managed institutions. The BOP reports that it has administered a total of 330,593 doses to inmates and staff members.[9] Going forward, BOP will continue to offer inmates vaccines, as well as vaccine boosters, as expeditiously as possible as supplies are available. The latest information on BOP's vaccination efforts, including the number of completed vaccinations at each institution, is available at https://www.bop.gov/coronavirus/, and is updated every weekday.

## IV. DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE

On or about January 19, 2022, the defendant submitted to the authorities at FCI Terre Haute, an administrative request to have his sentenced reduced to "time served" due to the ongoing COVID 19 public health emergency. Ex. A. On or about February 9, 2022, the warden denied the defendant's request. Ex. B.

On or about August 9, 2022, the defendant filed his motion for compassionate release with this Court. R. 111. The defendant askes this Court to reduce his sentence based on his fear of contracting COVID 19 and his medical conditions (psoriasis, psoriatic arthritis, ankylosing spondylitis, and difficulty breathing). *Id.* at 1. More specifically, defendant requests a modification of his sentence to "time served." *Id.* at 2.

---

[9] See Federal Bureau of Prisons, COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (last accessed Oct. 7, 2022).

## ARGUMENT

### I. Defendant Is Ineligible for Relief Under 18 U.S.C. § 3582(c)(1).

#### A. Legal Standard

As amended by Section 603(b) of the First Step Act of 2018, Pub. L. 115-391, Title 18, United States Code, Section 3582(c)(1)(A) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a reduction; or
> >
> > (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Direct of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Pursuant to Congress's directive, prior to the enactment of the First Step Act, the Sentencing Commission promulgated U.S.S.G. § 1B1.13, which sets forth the Sentencing Commission's policy statement with respect to § 3582(c)(1)(A). Consistent

with § 3852(c)(1)(A)(i), § 1B1.13 provides that a court may reduce a term of imprisonment, after considering the Section 3553(a) factors, if three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)"; and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.

Thus, in order to obtain relief under § 3582(c)(1)(A)(i), the defendant must show that: (1) he has requested relief from the BOP and exhausted any administrative appeals in that process; (2) there exist extraordinary and compelling reasons that warrant a sentence reduction; (3) the requested reduction is consistent with the policy statements issued by the sentencing commission in Guideline §1B1.13, including the requirement that "the defendant is not a danger to the safety of any other person or to the community"; and (4) the reduction is warranted in light of the factors listed in 18 U.S.C. § 3553.

As Congress expressly directed, the Sentencing Commission's policy statement defined the "extraordinary and compelling reasons" that might warrant a sentence reduction under § 3582(c)(1)(A)(i). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone

11

shall not be considered an extraordinary and compelling reason."); *United States v. Saldana*, 807 F. App'x. 816, 819 (10th Cir. 2020).

Application Note 1 to Guideline § 1B1.13 limited the "extraordinary and compelling reasons" for which a sentencing reduction is appropriate to the following particular circumstances:

(1) The defendant suffers from a "terminal illness" or his physical and mental condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

(2) The defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served the lesser of 10 years or 75% of his sentence. *Id.* cmt. n.1(B).

(3) The defendant's family circumstances include either the death or incapacitation of the caregiver of the defendant's minor child or minor children or the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. *Id.* cmt. n.1(C).

(4) "As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* cmt. n.1(D).

Guideline § 1B1.13 cmt. n.1.

In *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020), the Seventh Circuit held that, because Guideline § 1B1.13 has not been amended following the enactment of the First Step Act, "the Guidelines Manual lacks an 'applicable' policy statement covering prisoner-initiated applications for compassionate release." *Id.* at 1181. Therefore, the court held, district courts are free to consider prisoners' motions for a sentence reduction on grounds other than the categories of extraordinary and

12

compelling reasons listed in Guideline § 1B1.13, as limited by the statute itself. *Id.*

However, the court pointed out:

> The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused.

*Id.* Therefore, pursuant to *Gunn*, Guideline § 1B1.13 remains instructive, though not exhaustive, in determining the meaning of the term "extraordinary and compelling reasons" for purposes of § 3582(c)(1)(A)(i).[10]

Subsequently, the Seventh Circuit provided further guidance regarding consideration of motions for discretionary sentencing reductions under § 3582(c)(1)(A), suggesting a two-step analysis following exhaustion of administrative remedies:

> At step one, the prisoner must identify an "extraordinary and compelling" reason warranting a sentence reduction . . . . Upon a finding that the prisoner has supplied such a reason, the second step of the analysis requires the district court, in exercising the discretion conferred by the compassionate release statute, to consider any applicable sentencing factors in § 3553(a) as part of determining what sentence reduction to award the prisoner.

_____

[10] The government argued in *Gunn* and in numerous other cases that Guideline § 1B1.13 is binding on the district court in determining motions for compassionate release brought by defendants, and that the courts lack authority to grant relief under the statute on bases other than those enumerated in the application notes that accompany § 1B1.13. The government acknowledges that this argument is foreclosed by *Gunn*. However, the government preserves for potential further review its arguments that *Gunn* was wrongly decided, and that a sentence reduction may be granted under § 3582(c)(1)(A)(i) only where the defendant has established an extraordinary and compelling reason, as defined by Application Notes 1(A) through 1(C) to Guideline § 1B1.13.

*United States v. Thacker*, 4 F.4th 569, 576 (7th Cir. 2021).

     **B.**     **Defendant Has Complied With § 3582(c)(1)'s Requirement That He Exhaust His Administrative Remedies.**

As stated above, according to 18 U.S.C. § 3582(c)(1), a defendant is free to bring a motion for compassionate release after he has exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf, or 30 days have elapsed since the receipt of such a request by the warden of the defendant's facility, whichever is earlier. The defendant submitted a request for a reduction of sentence on January 19, 2022, (Ex. A) and that request was denied on or about February 9, 2022. (Ex. B). Because more than 30 days have elapsed since the warden received defendant's administrative request, the defendant has satisfied the statutory exhaustion requirement set forth in § 3582(c)(1)(A).

     **C.**     **Defendant Has Not Established "Extraordinary and Compelling Reasons" for Consideration of a Sentence Reduction**.

The defendant seeks release pursuant to § 3582(c)(1)(A), which allows for such relief where, "after considering the factors set forth in section 3553(a) . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Specifically, defendant essentially asserts that he has demonstrated extraordinary and compelling reasons based on the COVID-19 pandemic and a

14

number of medical conditions. These conditions include psoriasis, psoriatic arthritis, ankylosing spondylitis, and difficulty breathing. *See* R. #111, at 1-9.

Each of his medical conditions are addressed below.

Psoriasis. Medical records confirm that defendant suffers from psoriasis. Ex. C at 223. Psoriasis is a chronic autoimmune skin disease that speeds up the growth cycle of skin cells.[11] Treatments range from creams and ointments applied to the affected areas to ultraviolet light therapy to drugs (such as methotrexate).[12] The CDC does not recognize psoriasis as a condition that increases the risk of serious illness should defendant contract COVID-19.[13] In addition, according to the defendant's medical records, as of February 16, 2022, his "psoriasis is under good control." Ex. C at 71.

Psoriatic Arthritis. Defendant also cites psoriatic arthritis, which is supported by his medical records. Ex. C at 2. Psoriatic arthritis is an inflammatory type of arthritis that eventually occurs in 10% to 20% of people with psoriasis. It is different from more common types of arthritis (such as osteoarthritis or rheumatoid arthritis) and is thought to be related to the underlying problem of psoriasis.[14] Nonetheless,

---

[11] https://www.cdc.gov/psoriasis/index.htm#:~:text=Psoriasis%20causes%20patches%20of%20thick,psoriasis%20is%20called%20plaque%20psoriasis.

[12] *Id.*

[13] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 7, 2022).

[14] *Id.*

15

current CDC guidance does not identify psoriatic arthritis as a condition that increases the risk of severe illness from COVID-19.[15]

Ankylosing Spondylitis. Defendant also cites ankylosing spondylitis. Ankylosing spondylitis is an inflammatory disease that, over time, can cause some of the bones in the spine (vertebrae) to fuse. This fusing makes the spine less flexible and can result in a hunched posture. If ribs are affected, it can be difficult to breathe deeply.[16] His medical records state that his past medical history reported ankylosing spondylitis but there is no specific diagnosis in the records. Ex. C at 188. Nonetheless, current CDC guidance does not identify ankylosing spondylitis as a condition that increases the risk of severe illness from COVID-19.[17]

Difficulty Breathing - Defendant also cites difficulty breathing. He uses an albuterol inhaler (Ex. C at 120) and on October 4, 2021, he informed a medical provider that has a history of asthma. Ex. C at 92. However, there has been no diagnosis of asthma or any other respiratory disease, and his medical records indicate that asthma is unlikely and that his "lung exam is unremarkable." Ex. C at 95. A medical assessment on February 16, 2022, found his shortness of breath to be

---

[15] *Id.*

[16] https://www.mayoclinic.org/diseases-conditions/ankylosing-spondylitis/symptoms-causes/syc-20354808#:~:text=Ankylosing%20spondylitis%20is%20an%20inflammatory,be%20difficult%20to%20breathe%20deeply.

[17] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Oct. 7, 2022).

16

"resolved." Ex. C at 69. According to the CDC, people with moderate to severe asthma can suffer from a severe illness if they contract COVID-19, however, there is no indication that the defendant has asthma or that his breathing issues are moderate to severe.[18]

In sum, defendant's medical records reflect that he is being treated for all of his medical conditions and that none of the conditions from which he suffers are identified by the CDC as ones that increase his risk of serious illness or death should he contract COVID-19.

Importantly, defendant's medical records also establish that he is fully vaccinated against COVID-19, which drastically decreases the risk he faces from COVID-19. *See* Ex. C at 245.

The CDC has explained that an individual is "considered fully vaccinated two weeks after their second dose in a two-dose series, such as the Pfizer-BioNTech and Moderna vaccines…" Frequently Asked Questions about COVID-19 Vaccination, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html (last updated Oct. 3, 2022). Being fully vaccinated significantly reduces an individual's risk of getting seriously ill from COVID-19. The CDC states that "COVID 19 vaccines are effective at protecting people from getting seriously ill, being hospitalized, and even

---

[18] *Id.*

17

dying" and that "studies following the use of the vaccines showed approximately 90% protection against symptomatic infection, severe illness, and death."[19]

Furthermore, the CDC states that a fully vaccinated individual who contracts "breakthrough" infections are "much less likely to experience severe symptoms than people who are unvaccinated."[20] Accordingly, at this time, the available vaccines permit effective self-care against severe illness or death that may be caused by COVID-19, even for persons who, like defendant, suffer from chronic medical conditions.

The Seventh Circuit has held that "the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release," unless the prisoner can establish, with individualized medical evidence, that that they cannot receive or benefit from the vaccine, and are thus remain particularly vulnerable to serious complications from the virus. *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021). *See also United States v. Barbee*, 25 F.4th 531, 533 (7th Cir. 2022). Defendant has provided no individualized medical evidence showing that he is immuno-compromised or otherwise particularly vulnerable to serious complications from COVID-19 despite being fully vaccinated.

---

[19] *See* Benefits of Getting a COVID-19 Vaccine, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits.html (last accessed Oct. 7, 2022).

[20] *See* https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/why-measure-effectiveness/breakthrough-cases.html (last accessed Oct. 7, 2022).

Given that defendant is fully vaccinated, that he suffers from no medical conditions that put him at substantially increased risk despite vaccination, and that his risk of infection is even further reduced by the conditions at FCI Terre Haute, including the extremely low number of active infections at the facility, defendant has failed to establish extraordinary and compelling reasons warranting consideration of a sentence reduction under 18 U.S.C. 3582(c)(1)(A)(i), particularly as measured against Guideline § 1B1.13 cmt. n.1(A)(ii)(I); *Gunn*, 980 F.3d at 1180 (characterizing § 1B1.13 and its Application Notes as providing a "working definition" of "extraordinary and compelling reasons" under the statute).

### D. Defendant's Release Would Not Be Consistent with the Statutory Factors Set Forth in § 3553(a).

This Court must also consider whether his release would be consistent with the factors set forth in 18 U.S.C. § 3553(a). In light of the § 3553(a) factors this Court should deny defendant's request for compassionate release.

Defendant's criminal conduct was serious. Defendant, despite being interviewed by the FBI after Adel Daoud's arrest, and after efforts by his family to thwart his plans, did not heed any of these warnings and was committed to travel to Syria to join a terrorist organization with the goal of committing a martyrdom operation.

In sum, given the severity of his criminal conduct, coupled with his vaccinations he has already received, and the disassociation between his medical

19

conditions and the risk of severe illness if he were to test positive for COVID 19, early release of the defendant is not warranted.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that this Court deny defendant's motion.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By:     */s/Barry Jonas*
Barry Jonas
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300

Date: October 7, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2022, I electronically filed the foregoing GOVERNMENT'S RESPONSE TO DEFENDANT ADEL TOUNISI'S MOTION FOR COMPASSIONATE RELEASE with the Clerk of the Court for the United States District Court for the Northern District of Illinois by using the CM/ECF system. I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, to the following non-CM/ECF participants:

Abdella Tounisi
#43307-424
TERRE HAUTE FCI
P.O. Box 33
Terre Haute, IN  47808

Respectfully submitted.

By:     /s/ Barry Jonas
BARRY JONAS
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois
(312) 353-5300
Barry.Jonas@usdoj.gov